AO 106 (REV 4/10) Affidavit for Search Warrant                         AUSA Vikas Didwania, (312) 353-8898

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### UNDER SEAL

In the Matter of the Search of:          Case Number:   24 M 218

1537 N. Western Avenue, First Floor Unit, Chicago,
Illinois 60622, further described in Attachment A

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Leah K. Roth, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, and contraband.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841 | Possession with intent to distribute controlled substances |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

JOHN P MCDONNELL    Digitally signed by JOHN P MCDONNELL
Date: 2024.03.22 15:25:33 -05'00'

*Applicant's Signature*

JOHN MCDONNELL, Task Force Officer
Homeland Security Investigations
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: March 22, 2024

*Judge's signature*

City and State: Chicago, Illinois          KERI L. HOLLEB HOTALING, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT    )
                                         )     ss
NORTHERN DISTRICT OF ILLINOIS   )

## AFFIDAVIT

I, John McDonnell, being duly sworn, state as follows:

### Background of Affiant

1.　　I am a Task Force Officer ("TFO") with the Department of Homeland Security ("DHS") Homeland Security Investigations ("HSI") and have been so employed since approximately 2023.  I am a sworn police officer in the state of Illinois with ten years of full-time experience, including three years' experience with a Special Operations Group. I am currently assigned to HSI Chicago's Gang and Violent Crimes Task Force (GVCTF).

2.　　My duties with HSI involve investigating criminal violations of the federal narcotics and importation laws, including but not limited to Title 21, United States Code, Sections 841 and 846. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

3.　　I have received training in narcotics investigations, money laundering, financial investigations, and various methods which drug dealers use to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

1

4.      I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence, searched for and recovered, in these locations has included controlled substances, communications regarding distribution and receipt of controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PURPOSE OF THE AFFIDAVIT

6.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to search the residence 1537 N. Western Avenue, Chicago, Illinois, 60622, First Floor Unit, further described in Attachment A (the "**Subject Residence**") for evidence, instrumentalities, and contraband described further in Attachment B, concerning possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841 (the "Subject Offenses").

2

## FACTS IN SUPPORT OF PROBABLE CAUSE

7.      In or about January 2024, HSI received information from a confidential source (CS1[1]) that a person CS1 knows as "Hugo" was selling cocaine in the Chicagoland area. CS1 relayed that Hugo's nickname in the "street" was "Juiceman" and his Facebook name was "Spanish Harlem."

8.      Based on CS1's information, law enforcement identified "Hugo" as potentially being "Hugo Patino PINZON." Law enforcement showed CS1 a photo of PINZON obtained from an Illinois Secretary of State driver's license database. CS1 positively identified the photo of PINZON as the person CS1 referenced as "Hugo." PINZON's driver's license photo was consistent with the profile photo for the Facebook user "Spanish Harlem." The URL for the "Spanish Harlem" Facebook profile was https://www.facebook.com/spanish.harlem.14.

9.      In or about mid-January 2024, CS1 had a FaceTime video chat with PINZON.  This video chat was unrecorded and was not observed by law enforcement.

---

[1] CS1 was observed by law enforcement approximately four months ago engaging in potential narcotics violations. When approached by law enforcement, CS1 agreed to cooperate with law enforcement. CS1 does not have pending charges but is cooperating with the hope that no charges will be filed. CS1 has provided law enforcement credible information that has been corroborated through recordings, social media information, and surveillance, some of which is described in this affidavit. Since cooperating with law enforcement, on several occasions, CS1 provided information which led to the successful seizure of controlled substances, cash, and firearms. After these successful seizures, in or about January 2024, CS1 was informed that law enforcement would not propose charges to prosecuting authorities arising from the potential narcotics violations previously observed if CS1 provided information that led to one more similar seizure. CS1 has a criminal history that includes 9 convictions for assault, 1 for obstructing justice, 8 for traffic violations, 2 for invasion of privacy, 10 for narcotics, 1 for flight/escape, and 2 for breach of public peace/disorderly conduct.  CS1 also has arrests that did not lead to convictions.  On or about March 5, 2024, CS1 died from injuries sustained from a traffic accident.

According to CS1, PINZON mentioned during this video chat that he had cocaine for sale and showed CS1 what was for sale. CS1 observed what appeared to be a white shaped, rectangular brick with the NBA logo (basketball player appearing to dribble a ball) stamped on the brick. According to CS1, based on CS1's background and knowledge of drug sales, CS1 recognized this to be a kilogram of cocaine.

### First Controlled Buy with PINZON

10.     In or about mid-January 2024, CS1, at the direction of law enforcement, purchased cocaine from PINZON in Chicago.

11.     According to CS1, PINZON stated over FaceTime he would sell him "four and a split" for "25." This call was unrecorded and was not observed by law enforcement. Based on my training and experience, along with information relayed from CS1, I believe PINZON was willing to sell CS1 4.5 ounces of cocaine for $2,500. During the call, CS1 agreed to the purchase.

12.     On January 16, 2024, on the day of the transaction, CS1 met with law enforcement at a predetermined location. CS1 and their vehicle were searched for money and illegal substances, with negative findings. CS1 was given $2,500 and CS1 was outfitted with a recording device. CS1, while under constant surveillance of law enforcement, drove to the transaction location in Chicago, Illinois. Law enforcement set up surveillance at the location. Surveillance observed CS1 exit their vehicle and walk up to Target Vehicle 1, with PINZON seated in the driver's seat.[2] CS1 was observed

---

2 Target Vehicle 1 was a dark-colored Nissan SUV, bearing IL registration FP126948.  It was registered to EAN Holdings LLC. According to Enterprise Rent-A-Car, Target Vehicle 1 was

opening the front passenger door of Target Vehicle 1.

13.     According to a video recording of the transaction and CS1, PINZON handed a white substance in a clear plastic bag to CS1. PINZON, in exchange, took the buy funds that the CS1 had been given. CS1 then shut the passenger side door. Surveillance observed Target Vehicle 1 leave the location.

14.     CS1 departed the meet location while law enforcement maintained surveillance.  Upon arriving at a pre-determined location, CS1 turned over the white powdery substance CS1 had purchased from PINZON. CS1 stated they purchased the substance from the subject they knew as Hugo. CS1 and their vehicle were searched again for any contraband, resulting in negative findings.  A field test on the white powdery substance indicated positive results for the presence of cocaine.

### Second Controlled Buy with PINZON

15.     In late-January 2024, CS1, at the direction of law enforcement, again purchased cocaine from PINZON in Chicago.

16.     According to CS1, in or about late-January 2024, CS1 placed a Facetime video call to PINZON. This call was audio/video recorded. PINZON's face could be seen on the screen of CS1's phone. CS1 told PINZON that CS1 wanted to buy "a four and a splitty my boy" [4.5 ounces of cocaine]. PINZON replied with "bet" [agreeing to the transaction].

17.     On January 25, 2024, the day of the transaction, CS1 met with law

_____

rented under the name Individual A from December 21, 2023 to January 18, 2024.

enforcement at a pre-determined location. CS1 was searched for money or any illegal substances with negative findings. CS1 was provided with $2,500 in buy funds. CS1 was outfitted with a recording device. CS1 was driven to the transaction location by an undercover agent in the undercover agent's vehicle. Law enforcement set up surveillance at the transaction location. Surveillance observed CS1 exit the vehicle and walk up to Target Vehicle 2. Surveillance could not observe who was seated in the driver's seat due to the tinting of the window. CS1 opened the front passenger door of Target Vehicle 2.

18.     According to CS1, PINZON handed a white substance in a clear plastic bag to CS1. PINZON in exchange took the $2,500 from CS1. CS1 then shut the passenger side door of Target Vehicle 2 and walked away.

19.     According to surveillance, PINZON then left the area and proceeded to park in the 1500 block of N. Western Avenue, near the **Subject Residence**.

20.     CS1 was driven away from the location by the undercover agent to a predetermined location. CS1 turned over the suspected cocaine purchased from PINZON. CS1 was searched again for any contraband with negative findings. A field narcotics test on the white powdery substance indicated positive results for the presence of cocaine.

21.     Target Vehicle 2 is a gray Toyota RAV4, bearing Florida license plate KBZZ01, VIN 2T3P1RFV1MW217867. According to government records, Target Vehicle 2 is registered to EAN Holdings LLC. According to records from Enterprise Rent-A-Car, Target Vehicle 2 was rented to an individual named Individual A for the period of January 16, 2024 to February 15, 2024.

22.     On February 1, 2024, surveillance units in the 1500 block of N. Western

Avenue observed PINZON exiting **Subject Residence** and enter Target Vehicle 2.

### *Target Vehicle 2*

23.     On February 5, 2024, Magistrate Judge Maria Valdez of the Northern District of Illinois authorized the installation and monitoring of a GPS tracking device on Target Vehicle 2 (reference 24 M 75).

24.     On February 6, 2024, agents installed a GPS tracking device on Target Vehicle 2 in the 1500 block of N. Western Avenue, Chicago (near the **Subject Residence**).

25.     On February 6, 2024, surveillance units in the 1500 block of N. Western Avenue observed PINZON exiting **Subject Residence** and enter Target Vehicle 2.

26.     On February 6, 2024, Enterprise Rent-A-Car contacted HSI and advised that Target Vehicle 2 had been returned to them in the morning hours of February 6, 2024.

27.     On February 7, 2024, HSI recovered the vehicle GPS Tracker from Target Vehicle 2 at Enterprise Rent-A-Car at 1842 N. Milwaukee Avenue, Chicago.

### *Target Vehicle 3*

28.     Enterprise Rent-A-Car advised HSI that the person who returned Target Vehicle 2 was a Individual A, and that he had rented another vehicle, namely, a white 2023 Hyundai Santa Fe ("Target Vehicle 3").

29.     On February 7, 2024, HSI observed Target Vehicle 3 parked in the 1500 block of N. Western Avenue, Chicago.  Surveillance further observed PINZON exiting the **Subject Residence** and entering and operating Target Vehicle 3.  A short time later,

Target Vehicle 3 returned to the 1500 block of N. Western Avenue, Chicago, and parked along the street. PINZON was seen exiting the driver's seat of Target Vehicle 3 and entering the **Subject Residence**.

30.     According to Enterprise Rent-A-Car, Target Vehicle 3 was rented under the name Individual A on February 6, 2024 with a scheduled return date of February 15, 2024.

31.     On February 8, 2024, Magistrate Judge Maria Valdez of the Northern District of Illinois authorized the installation and monitoring of a GPS tracking device on Target Vehicle 3 (reference 24 M 85).

32.     On February 9, 2024, agents installed a GPS tracking device on Target Vehicle 3 in the 1500 block of N. Western Avenue, in Chicago (near the **Subject Residence**).

### *Third Controlled Buy with PINZON*

33.     In mid-February 2024, CS1, at the direction of law enforcement, purchased cocaine from PINZON in Chicago. According to CS1, in or about mid-February 2024, while driving, CS1 placed an unrecorded Facetime video call to PINZON in which CS-1 arranged to buy "quarter key," meaning 0.25 kilograms of cocaine for $4,250. PINZON agreed to meet CS1 on Bell Avenue north of W. Le Moyne Street in Chicago.

34.     GPS monitoring of Target Vehicle 3 revealed that it had traveled from Chicago directly to a fast-food parking lot in Highland Park and spent approximately 7 minutes there before heading back to Chicago. Surveillance video at the fast-food restaurant was obtained and Target Vehicle 3 was observed pulling into the parking lot

and exchanging duffle style bags with a subject in another vehicle. Both vehicles departed the target location. Target Vehicle 3 was then monitored driving back to **Subject Residence**. Surveillance units observed Target Vehicle 3 park in front of the **Subject Residence**. PINZON exited Target Vehicle 3 and carried multiple shopping bags into the **Subject Residence**.

35.     On February 14, 2024, the day of the transaction, CS1 met with law enforcement at a pre-determined location. CS1 was searched for money and illegal substances with negative findings. CS1 was provided with $4,250 in buy funds. CS1 was outfitted with a recording device. CS1, while under constant surveillance of law enforcement, drove to the transaction location in Chicago, Illinois.

36.     Surveillance units positioned outside of the **Subject Residence** observed PINZON exit the **Subject Residence** and enter Target Vehicle 3. CS1 called PINZON and told him that he/she was about to be there in 3 minutes. PINZON responded, "I'm glad you called; I was just about to shoot downtown."  The call was recorded.

37.     Surveillance units observed Target Vehicle 3 travel down the rear alley behind the **Subject Residence**.  The surveillance units lost sight of Target Vehicle 3 as they did not want to follow PINZON down the alley.  However, GPS data showed Target Vehicle 3 stopped directly behind the **Subject Residence**.

38.     According to GPS data, Target Vehicle 3 drove southbound down the alley from behind the **Subject Residence** towards the pre-determined meet location. Surveillance units were then able to maintain constant surveillance of Target Vehicle 3.

39.     According to surveillance, and audio/video recording, once Target Vehicle

9

3 arrived at the pre-determined meet location, CS1 entered Target Vehicle 3.

40.     According to a video and audio recording of the transaction and CS1, PINZON handed something to CS1 and CS1 placed it in a backpack. PINZON, in exchange, took the buy funds that the CS1 had been given.

41.     According to a video and audio recording of the transaction and CS1, CS1 and PINZON discussed what logo was stamped on the bricks of cocaine being distributed by PINZON.  Based on my knowledge, training, and experience, bricks or kilograms of cocaine often are stamped with a logo, including by the supplier as a trademark stamp. CS1 asked if it was the NBA logo still and PINZON replied that it was "Sonic," referencing the cartoon character Sonic the Hedgehog. As CS1 exited Target Vehicle 3, surveillance observed that CS1 may have hit a vehicle in traffic with the car door. PINZON exited Target Vehicle 3 and surveillance units were able to positively identify PINZON as the driver of Target Vehicle 3. Surveillance observed Target Vehicle 3 leave the location.

42.     CS1 departed the meeting location while law enforcement maintained surveillance.  Upon arriving at a pre-determined location, CS1 turned over the white powdery substance CS1 had purchased from PINZON. CS1 stated they purchased the substance from the subject they knew as Hugo. CS1 and their vehicle were searched again for any contraband, resulting in negative findings.  A field test on the white powdery substance indicated positive results for the presence of cocaine.

43.     CS1 advised that PINZON mentioned that he was going to downtown Chicago after their deal to pick up "loud," meaning cannabis. Target Vehicle 3 was

tracked to downtown Chicago and Chicago Police Department, with the assistance of HSI, attempted to conduct a traffic stop on Target Vehicle 3, but Target Vehicle 3 began to flee. Target Vehicle 3 was stopped using a device. PINZON was positively identified as the driver and sole occupant of Target Vehicle 3.

44.     Officers conducted a search of Target Vehicle 3.  Approximately two pounds of a green leafy substance was recovered from Target Vehicle 3. The green leafy substance was sent to the lab for testing.

45.     Target Vehicle 3 was towed to the Chicago Police Department per their policy and procedures while PINZON was processed. While at the Chicago Police Department, the GPS tracker was removed by agents.

46.     PINZON was released on unrelated traffic offenses and Target Vehicle 3 was released back to PINZON.

47.     On February 15, 2024, Enterprise rental car advised that Individual A had returned Target Vehicle 3.

48.     Throughout the month of February, 2024, GPS tracking data places Target Vehicle 2 and 3 within a block of the **Subject Residence** in the late evening to early morning hours.

### *Target Vehicle 4*

49.     On March 13, 2024, a manager at Enterprise Rent-A-Car advised that around 12:30 P.M. CT, a black 2022 Volkswagen Passat bearing IL registration FP 236116 and VIN 1VWSA7A32NC009972 ("Target Vehicle 4") was rented by Black male who was accompanied by a Hispanic male. The manager was shown a picture of

Individual A and confirmed he was the Black male. He was shown a picture of

PINZON and confirmed that was the Hispanic male. Both had come inside Enterprise

Rent-A-Car branch at 8225 Skokie Blvd, Skokie, IL 60077 to rent a car under Individual A

name.

50. On March 13, 2024, surveillance units saw PINZON exit the **Subject**

**Residence** and enter the driver's seat of Target Vehicle 4 and drive away. PINZON was

accompanied by a woman, later identified as Individual B.

### *The Subject Residence*

51. The **Subject Residence** is a three-story brick building, further identified in

Attachment A, with a unit on each floor. As described below, I believe PINZON resides

in the first-floor unit.

52. On March 20, 2024, PINZON's partner, Individual B,[3] was observed

leaving the **Subject Residence** with a young male child. Individual B then proceeded with

the young male child in Target Vehicle 4 to a school (the "Subject School"). Individual B was

seen outside Target Vehicle 4 placing a jacket on the young male child and walked him

into the Subject School. Individual B proceeded in Target Vehicle 4 back to the **Subject**

**Residence.** Individual B was then observed entering **Subject Residence.**

53. On March 20, 2024, PINZON was observed leaving the **Subject Residence**

---

[3] Individual B was identified based on a comparison to a driver's license photo. I believe Individual B
to be PINZON's partner based in part on the information described above and on publicly
available social media posts, which show's PINZON's profile with photos of himself, Individual B, their
shared children, posts regarding Individual B 's business ( LLC), and shoes for sale. Also,
surveillance has seen Individual B and PINZON leaving the **Subject Residence** together on multiple
occasions and PINZON driving Individual B to work on several mornings.

observed with a plastic grocery type of bag before entering Target Vehicle 4. PINZON then drove Target Vehicle 4 to two different locations before returning to **Subject Residence** and parking outside **Subject Residence.** He was observed entering **Subject Residence** with empty hands.

54.     On March 20, 2024, the black Chevrolet Malibu (IL# ▮▮▮▮▮, registered to Individual A) that was seen dropping PINZON off at Enterprise-Rent-A-Car on March 13, 2024, parked in front of the **Subject Residence**. Individual A exited the black Malibu and entered the **Subject Residence**.

55.     Approximately one hour later, PINZON and Individual A were observed leaving the **Subject Residence** together. PINZON entered Target Vehicle 4. Individual A had a large brown paper bag in his hand. The bag was rolled at the top and appeared to contain something heavy in nature. The bag was placed in the trunk and Individual A proceeded away from the **Subject Residence**.

56.     On March 20, 2024, I spoke to the administration at the Subject School. They advised that PINZON's son, who has the same last name, goes to their school and is in pre-kindergarten. They advised the listed parents on their contact/emergency form are PINZON and Individual B both listing their address as 1537 N. Western Ave, Chicago, IL (the **Subject Residence**).

57.     Accurint, a law enforcement database, shows that Individual B is associated with 1537 N. Avenue #1, Chicago, IL.

58.     On March 20, 2024, surveillance observed PINZON leave the **Subject Residence** in Target Vehicle 4. He made several stops that lasted less than a few minutes

each. PINZON then proceeded back to the residence and was observed parking outside **Subject Residence**. PINZON was positively identified by surveillance units that were on foot. Those surveillance units were able to observe PINZON walking into the **Subject Residence** building. They were also able to surveil PINZON walking to unit #1, entering his keys into the door, and crossing the threshold of unit #1.

59.     According to records from the lease management company of the Subject Residence, the tenants of Unit #1 were identified as Amir Muhammad and Celeste Dunn. A lease was provided, and it showed both Muhammed and Dunn signing the lease on April 10, 2023, for the period of August 1, 2023 to July 31, 2024. No other occupants of the unit were listed. The contact number on the lease was 773-997-6428, which is the phone that PINZON used to communicate with CS1 in order to facilitate the sales of narcotics on January 16, 2024, January 25, 2024, and February 14, 2024, as described above.

60.     On February 17, 2024, CS1 advised that PINZON had called him from the telephone number (773) 410-8225. PINZON advised this was his new number from now on. The call was unrecorded but CS1 provided a screenshot of his cell phone that shows CS1 received a call from the x8225 on February 17, 2024 at 12:32 p.m. that lasted for approximately fifty seconds.

61.     T-Mobile provided records for the x6428 and x8225 numbers, and both are registered under the name Amir Muhammad.

62.     Based on my knowledge training and experience, narcotics traffickers take on fake identities to obscure their criminal activity with law enforcement. Celeste Dunn

14

and Amir Muhammad have yet to been identified and are believed to be the alias.[4]

## TRAINING AND EXPERIENCE

63.     Through training, experience, and discussions with other experienced agents, I know that:

      a.   Drug traffickers commonly maintain books, papers, files, and other records which reflect the names, addresses and/or telephone numbers of their suppliers, couriers, customers, and other associates in the illegal drug trade.

      b.   Drug traffickers maintain books, records, receipts, notes, ledgers, transportation and travel records, money orders, and other files relating to the purchase, packaging, sale, distribution, and transportation of their product.

      c.   Drug traffickers conceal in their residences the proceeds of their illegal activity, including large amounts of United States currency, financial instruments, and other items of value, as well as books and records regarding the acquisition, use, and disposition of such items of value.

      d.   When drug traffickers amass large proceeds from the sale of controlled substances, they attempt to legitimize these profits, often accomplishing this goal by using the services of banks, other financial institutions, and real estate brokers; and maintain books and papers related to such efforts.

---

[4] CS1 advised he/she knew of a subject by the name of Muhammad but was unaware of a fist name. They were introduced to Muhammed by PINZON as someone who was able to lease a property for individuals who could not pass a background check and or credit check. Muhammad would collect a pre-determined fee upfront and would collect rent monthly. I have not been able to follow-up with CS1 about this information because, as noted above, CS1 died.

e.   It is common for drug traffickers to maintain the aforementioned books, papers, and documents in secure places within their residences so that the drug traffickers have ready access to such information.

f.   Drug traffickers frequently take, or cause to be taken, photographs of themselves, their associates in the drug trade, property acquired from the distribution of drugs, and their product, and such photographs are often kept in their residences. Drug traffickers often place assets, including real and personal property, such as vehicles, in names other than their own to avoid the detection and forfeiture of such assets by government agencies; and that the drug traffickers continue to use these assets and to exercise dominion and control over them even though the assets are nominally owned by others.

g.   It is common practice for drug traffickers to conceal in their residences secure places to store the contraband including but not limited to safes and that once a sizeable load of contraband has been delivered, to repackage and break down larger quantities of illegal drugs into smaller more easily handled and concealed quantities for distribution; and that paraphernalia related to the packaging, cutting, weighing and distribution of contraband is usually secreted or stored in their residences. Residences provide ready access to contraband and proceeds and are secure.

64.    Based upon my training and experience, I know that cellular phones may contain relevant evidence of drug trafficking and money laundering offenses, including text messages and social media posts or messages made or received from the phones that are located in the memory of the phones, which messages may provide information

16

regarding the identities of, and the methods and means of operation and communication used by, the participants in the offenses that are the subject of this investigation. Moreover, digital photographs located in the memory of the phones may contain images of the tools or participants involved in the firearms, money laundering, and drug trafficking offenses. Moreover, digital photographs stored in the phones may contain images of the user of the phones the user's associates (including persons involved in or knowledgeable about the subject offenses), places frequented by the user of the phone leading up to and during the subject offenses, and locations and instrumentalities used in committing the subject offenses.

65.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under

investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

66.    Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (e.g., location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Location information can provide valuable evidence of narcotics offenses, such as the location of stash houses and drug transactions, and meeting locations with other drug traffickers or co-conspirators. Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

67.    Through experience as a law enforcement officer and through the experience of other law enforcement officers as conveyed to me, I have learned that individuals involved in criminal offenses, including the distribution of narcotics and laundering of drug trafficking proceeds, commonly use cellular telephones as a means to communicate.

68.    Based upon my training and experience, I know that individuals involved in

criminal offenses, including the distribution of narcotics and laundering of drug trafficking proceeds, also often store telephone numbers and names or nicknames of associates, suppliers, and customers on their telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging, various social media platforms, and digital photographs in furtherance of their criminal activity that are stored on cellular telephones.

69.     Additionally, it is common for individuals engaged in drug trafficking and money laundering offenses to possess and use multiple cellular telephones. In some instances, this can be attributed to offenders compartmentalizing their communications. For example, one cellular phone may be used to contact sources of supply or drug customers, while another cellular phone may be used for communication with money laundering contacts. As another example, an offender may intend to use one cellular phone for criminal activity, while reserving another "clean" cellular phone for routine conversations with family, friends, and associates. Even a "clean" phone, however, will contain relevant evidence described above, especially relevant location information. For example, sometimes a drug trafficker may take a "clean" phone to a stash house or meeting location in an effort to evade tracking by law enforcement. Drug traffickers also will switch phones to evade detection by law enforcement.

70.     Based on my training and experience, criminal organizations and their members are aware of law enforcement investigative techniques, including their use of toll analysis  and the ability to locate and obtain phone subscriber data from cellular phone companies.  To keep law enforcement from identifying their suppliers, customers,

and relevant associations, narcotics traffickers will often use multiple phones, including one cellular "burner" phone for each of the clientele.

71.     Because, as explained above, phones are associated with a target in this case, because there was telephonic communication between participants involved in the offenses being investigated, and because, in my experience and in the experience of other agents, defendants use telephones and smart devices to contact their associates, there is probable cause to believe that PINZON's phones contain evidence of drug trafficking offenses.

**BIOMETRIC ACCESS TO DEVICES**

72.     This warrant permits law enforcement agents to obtain from the person of PINZON the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock cell phones requiring such biometric access and subject to seizure pursuant to this warrant for which law enforcement reasonably believes that PINZON's physical biometric characteristics will unlock the phones.  The grounds for this request are as follows:

73.     I know from my training and experience, as well as from information found in publicly available materials, that some models of mobile devices offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

74.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

75.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

76.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face.  The device then directs an infrared light toward the user's face and activates an infrared-

21

sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

77. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

78. The passcode or password that would unlock the cell phones is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the cell phones, making the use of biometric features necessary to the execution of the search authorized by this warrant.

79. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8

hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

80. Due to the foregoing, if law enforcement personnel encounter that the phone subject to this warrant may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from the aforementioned person the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock the phone, including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the phone; (2) hold the phone in front of the face of the aforementioned person to activate the facial recognition feature; and/or (3) hold the phone in front of the face of the aforementioned person to activate the iris recognition feature, for the purpose of attempting to unlock the phone in order to search the contents as authorized by this warrant.

81. The proposed warrant does not authorize law enforcement to require that the aforementioned person state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the phone. Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display

23

of any biometric characteristics to compel the aforementioned person to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person would be permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person for the password to the phone, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks the phone, the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

## SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

82.     Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (e.g. computer hardware, computer software, computer related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.   Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting

process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.   Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

83.    In order to fully retrieve data from a cellular phone system, the analyst needs all storage media as well as the cellular phone. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).In addition, electronic storage media such as a cellular phone, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity

84.    Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure,

this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the Subject Phone 2 so that it may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

85.     The review of electronically stored information described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

        a.   Examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

        b.   searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

        c.   surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

        d.   opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be

seized as set forth in Attachment B.

       e.  The government will return the phone within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## CONCLUSION

86.    Based on the above information, I respectfully submit that there is probable cause to believe that narcotics offenses, in violation of Title 21, United States Code, Sections 841, have been committed, and that evidence, instrumentalities, and contraband relating to this criminal conduct, as further described in Attachment B, will be found in **Subject Residence**, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant for the premises of 1537 N. Western Avenue, Chicago, Illinois, 60622, First Floor Unit, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

FURTHER AFFIANT SAYETH NOT.

JOHN P MCDONNELL
Digitally signed by JOHN P MCDONNELL
Date: 2024.03.22 15:27:27 -05'00'

John McDonnell
Task Force Officer
Homeland Security Investigations

Sworn to and affirmed by telephone on March 22, 2024

_____

HONORABLE KERI L. HOLLEB HOTALING
UNITED STATES MAGISTRATE JUDGE

27

## ATTACHMENT A

**Description of Premises to be searched.**

The first-floor unit of a converted multi-family home located at 1537 N. Western Avenue, Chicago, Illinois 60622, as depicted below (the **"Subject Residence"**). The first-floor unit is located on the 1st floor and accessed by a flight of common stairs outside the building, covered buy a white overhang. The subject residence has a rear balcony on the first floor.





## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

Evidence, instrumentalities, and contraband concerning narcotics trafficking offenses, in violation of Title 21, United States Code, Sections 841, as follows:

1.     Controlled substances;

2.     Drug paraphernalia;

3.     Cash;

4.     Items that reflect the contact information of drug suppliers, couriers, customers, and other associates in the illegal drug trade;

5.     Items relating to the purchase, packaging, sale, distribution, and transportation of narcotics;

6.     Indicia of ownership, occupancy, or use of the **Subject Residence**;

7.     Evidence of user attribution showing who used or owned the electronic devices subject to seizure at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history

8.     Any location information concerning the whereabouts of the participants and/or coconspirators involved in the Subject Offenses.

9.     With respect to electronic devices, law enforcement personnel are limited to searching and/or seizing devices reasonably believed to be used by PINZON.

10.     During the execution of this search warrant at the **Subject Residence**, law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of

PINZON at the **Subject Residence** in order to gain access to the contents of electronic devices reasonably believed to be used by PINZON.

## ADDENDUM TO ATTACHMENT B

The government's review of electronic storage media, including cell phones, already in its possession shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

    a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

    b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

    c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

    d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

    e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.